UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 0:25-cr-00439 (DWF/EMB) |
| Plaintiff, | ) | |
| v. | ) | |
| JOSE ALBERTO ARROYO-SOTELO, | ) | St. Paul, Minnesota |
| | ) | **October 27, 2025** |
| | ) | 10:00 a.m. |
| Defendant. | ) | |

**BEFORE THE HONORABLE JOHN F. DOCHERTY**
**UNITED STATES DISTRICT MAGISTRATE JUDGE**

**PRELIMINARY HEARING/DETENTION HEARING**

APPEARANCES:

For the Government: Albania Concepcion
UNITED STATES ATTORNEY'S OFFICE
FOR THE DISTRICT OF MINNESOTA
300 South Fourth Street
Minneapolis, Minnesota 55415

For the Defendant: Katelyn Adams
OFFICE OF THE FEDERAL DEFENDER
300 South Fourth Street, Suite 107
Minneapolis, Minnesota 55415

Also Present: Constanza Raber, Federally Certified Court Interpreter

Court Reporter: Nancy J. Meyer
Registered Diplomate Reporter
Certified Realtime Reporter
Warren E. Burger Federal Building
and United States Courthouse
316 North Robert Street
St. Paul, Minnesota 55101

Proceedings reported by certified stenographer; transcript produced with computer technology.

# **I N D E X**


| **WITNESS:** | PAGE |
|---|---|
| **JEFFREY BENADUM** | |
| Direct Examination By Ms. Concepcion | 5 |
| Cross-Examination By Ms. Adams | 21 |

**P R O C E E D I N G S**

**IN OPEN COURT**

(Defendant present.)

THE COURT: Let's begin by swearing the interpreter. Please raise your right hand.

(Oath administered.)

THE INTERPRETER: I do.

THE COURT: And could you tell us your name for the record, please.

THE INTERPRETER: Constanza Raber, federally certified Spanish interpreter.

THE COURT: Good morning, Mr. Arroyo-Sotelo.

We are here this morning for a preliminary hearing and a detention hearing in the case of the United States of America v. Jose Alberto Arroyo-Sotelo. I hope I pronounced that properly. If I haven't, please let me know.

Let's begin by getting appearances, please, beginning with counsel for the United States.

MS. CONCEPCION: Good morning, Your Honor. AUSA Albania Concepcion for the United States.

THE COURT: Good morning, Ms. Concepcion.

MS. ADAMS: Good morning, Your Honor. Kate Adams for Mr. Arroyo-Sotelo, who is seated by me at counsel table.

THE COURT: Ms. Adams, have there been any discussions or agreements between the parties as to the two

issues for this morning, or are we going to have them both?

MS. ADAMS: We're going with both, Your Honor.

THE COURT: So, Ms. Concepcion, if that's your understanding as well, let's begin with the preliminary hearing.

THE COURT REPORTER: Judge, is your microphone on?

THE COURT: It's hard to tell because the light doesn't work.

THE COURT REPORTER: It is now.

THE COURT: It is now? Okay.

THE COURT REPORTER: Thank you.

THE COURT: You're welcome.

Ms. Concepcion, if that's also your understanding, you can proceed with the preliminary portion of this morning's proceedings.

MS. CONCEPCION: Thank you, Your Honor.

Your Honor, the government calls Special Agent Jeffrey Benadum.

THE COURT: Okay. Agent Benadum, come on up. The witness stand is right there, but if you stop there, I'll give you the oath.

(Oath administered.)

THE WITNESS: I do.

THE COURT: Special Agent Benadum, if you'd begin, before Ms. Concepcion starts, by telling us your first and

Benadum - Direct 5

last name and then, for the record, spell them both.

THE WITNESS: Jeffrey Benadum, J-e-f-f-r-e-y B-e-n-a-d-u-m.

THE COURT: Ms. Concepcion.

MS. CONCEPCION: Thank you, Your Honor.

(**Jeffrey Benadum**)

**DIRECT EXAMINATION**

BY MS. CONCEPCION:

Q. Special Agent Benadum, where are you employed?

A. Homeland Security Investigations.

Q. And what's your position with Homeland Security Investigations?

A. I'm a special agent.

Q. What are your duties and responsibilities as a special agent with Homeland Security Investigations? I'm going to say HSI for short.

A. I investigate a large array of crimes to include money laundering, bulk cash smuggling, child exploitation, immigration violations, human smuggling; an array of crimes.

Q. How long have you been a special agent with HSI?

A. For more than 28 years.

Q. Now, in those 28 years that you've been with HSI, have you assisted with things like search warrants and arrests?

A. Yes.

Q. And in your capacity as a special agent, do you carry a

firearm?
A. I do.
Q. I'm going to bring your attention to October 10th of 2025, the early morning hours. Do you have that date in mind?
A. Yes.
Q. What were you doing -- or were you on duty that day?
A. I was.
Q. And what were you doing -- what were you doing that day in Fridley, Minnesota, with agents from the United States Border Patrol and an IRS agent?
A. I was assigned to the enforcement and removal operations fugitive task force that day, and I was working with a group of other law enforcement entities to attempt to arrest a fugitive.
Q. Now, did agents have information that there was an individual who was believed to be unlawfully in the United States that agents were attempting to arrest?
A. Yes.
Q. Is that an individual with the initials D.A.R.?
A. I believe so.
Q. Now, I got a little bit ahead of myself.
So I just want to confirm for the judge, have you reviewed body-worn camera in this case?
A. Yes.

Q. One body-worn camera; is that correct?
A. Just one, yes.
Q. And have you also reviewed the complaint?
A. Yes.
Q. And to the best of your knowledge and recollection from what you observed, is the complaint true and accurate?
A. Yes.
Q. All right. Let's get back to the day of October 10th of 2025.
So agents were on a surveillance detail looking for an individual with the initials D.A.R.; is that correct?
A. I believe that was his correct initials, yes.
Q. Now, did you physically make yourself -- make your way to Fridley, Minnesota, as part of this surveillance detail?
A. Yes.
Q. And what happened while you were there?
A. While I was at the -- in the area of the location, the target address, the -- CBP Agent Miranda, who was the case agent that day, said via the radio -- he let the other members know that he saw the target leaving the residence and entering a black -- I mean, a red sedan.
Q. Did the target that -- so I'm sorry. You said that you were in radio communication with the other agents, the CBP officer?
A. Yes.

Q. Now, when the CBP officer aired that the target got into a red sedan, did they indicate which seat of the vehicle the person got into?
A. He said he was the driver.
Q. All right. Did anyone else enter the vehicle while it was still in Fridley?
A. Yes. A second -- a passenger who was also a target, but not from that day.
Q. And that second individual that entered the vehicle, was it aired which part of the vehicle that second individual got into?
A. No. It was just aired that a passenger had gotten -- someone had gotten in on the passenger side as well.
Q. All right. Now, once the red sedan -- excuse me. Once the target, D.A.R., was in the driver's seat and the passenger had gotten in, did that vehicle leave the Fridley address?
A. It did.
Q. And what happened next?
A. We conducted a surveillance follow, and the vehicle went to a second apartment complex.
Q. Where?
A. Brooklyn -- Brooklyn Center, Brooklyn -- Brooklyn Center, I believe. Brooklyn Park/Brooklyn Center.
Q. Okay. But still in the state and district of Minnesota?

A. Yes.
Q. All right. And then what happened when the vehicle was in Brooklyn Park or Brooklyn Center?
A. It picked up a third individual and then departed the part of the complex.
Q. Now, did you observe this or was this being aired over the radio to everyone who was on the detail?
A. I did not -- I did not observe who got in it, but I did see the vehicle leaving the complex.
Q. Understood.
Now, where did you stay after the third individual got into the red sedan?
A. I was parked in the complex where they picked the third individual up, and I stayed -- I remained there once they left just in case they -- to try to identify an apartment or another vehicle that was associated to where -- from that -- that apartment complex.
Q. Now, based on your review of the complaint, as well as body-worn camera, what happened when the red sedan left that Brooklyn Park/Brooklyn Center address?
A. The other law enforcement officers followed that vehicle away.
Q. Was the vehicle ultimately stopped?
A. Yes. The vehicle was -- they then aired they were going to conduct a vehicle stop on the vehicle.

Q. And when you say "they," just as a reminder, we're talking about CBP officers?

A. CBP Officer Miranda aired that they would be stopping the vehicle.

Q. Now, was the vehicle ultimately stopped?

A. It was.

Q. And what happened when the vehicle stopped and a CBP officer approached the vehicle?

A. From what I was told, the vehicle was stopped, a CBP officer approached the vehicle from the passenger side, identified the driver as the individual that they were looking for, then spoke to the passenger vehicle -- the person in the passenger seat, and then spoke to the person in the backseat and ultimately identified all -- attempted to identify all three of them.

The CBP Agent Miranda asked the passenger -- front-seat passenger to get out of the vehicle. He got out of the vehicle and at some point attempted to flee and fight with officers, the two other law enforcement officers that were there.

Q. So I'm going to go ahead and just unpack that just a little bit. You said from what you were told, but you also watched body-worn camera; is that correct?

A. Correct.

Q. So did you watch the body-worn camera of the officer who

approached the vehicle?
A. I did.
Q. Okay. Now, when the CBP officer approached the vehicle, was the driver positively identified as the target of the surveillance detail?
A. He was.
Q. How?
A. From -- from not just pictures, but also of Agent Miranda seeing that individual coming out of the residence of the -- and getting into the vehicle. And he was the owner of the vehicle, and it was registered to that same address.
Q. And did the driver also provide his name?
A. I believe so.
Q. And that name was consistent with the D.A.R. initials that agents were looking for?
A. I believe so.
Q. Now, you said that the CBP officer who approached the vehicle also made contact with the front passenger?
A. Yes.
Q. Okay. And then attempted to remove the front passenger from the vehicle?
A. Correct.
Q. What happened during that discussion, trying to get the front passenger out of the vehicle?

A. So from watching the video, Agent Miranda first spoke to the passenger in Spanish, and he said he didn't know -- he didn't speak Spanish. He told him that in English. So then he asked him in English, and then I think he responded in Spanish.

Q. What did the agent ask the front-seat passenger?

A. I don't recall exactly. I think he asked him for both a name and if he had any immigration documents to be in the United States.

Q. All right. And then did the front-seat passenger provide either a name or any sort of documentation?

A. Not to my knowledge.

Q. All right. Now, at this point, while this is all happening, are you still back at that address in Brooklyn Park or Brooklyn Center?

A. I was en route from the apartment complex to where the vehicle stop was.

Q. And why did you -- instead of staying there, why did you make your way over to the stop?

A. Well, because I knew there was three passengers in that vehicle and we only had three other law enforcement officers working that detail that day. So I went to help with law enforcement security and safety.

Q. Now, when you arrived on scene, what did you first observe?

A. I first observed Agent Miranda and IRS Special Agent Brummer fighting with the individual in the middle of Brooklyn Boulevard.
Q. Now, you just made a head movement there. Was that front-seat passenger ever identified?
A. Yes, he was.
Q. And was that front-seat passenger identified as the defendant, Jose Alberto Arroyo-Sotelo?
A. Yes.
Q. And do you recognize that person?
A. Yes, I do.
Q. Could you please point that person out in the courtroom for the judge.
A. He's sitting in the orange jumpsuit.
MS. CONCEPCION: Your Honor, if the Court could reflect an identification.
THE COURT: The record will so reflect.
BY MS. CONCEPCION:
Q. All right. So when you approached on scene, you said that you saw Mr. Arroyo-Sotelo fighting; is that correct?
A. Yes.
Q. Can you please be a little more specific.
A. The agents were attempting to get his arms under control and to -- to handcuff him, and he was fighting with them, punching them back, trying to get away from them.

Q. Did any part of Mr. Arroyo-Sotelo's body make contact with any part of those agents' bodies that you saw?
A. Yes. Yes.
Q. Okay. All right. Now, at any point did you approach the two officers that were attempting to restrain Mr. Arroyo-Sotelo?
A. I approached all three.
Q. Okay.
A. Yes.
Q. And can you describe for the Court what you observed as you approached all three.
A. As I approached all three, Agent Miranda was to the left of the defendant trying -- holding his arm from almost kind of the rear and trying to keep -- getting his arm behind him to, hopefully, put a handcuff on him. And he had his right arm around the defendant to keep him from moving and trying to get away, which he was kind of struggling trying to get away.
The IRS special agent was to my left, which was the defendant's right, trying to control his right arm and was trying to get a wrist lock, a wrist control, on his arm to -- so we could handcuff him.
Q. But just to set the scene, you have Mr. Arroyo-Sotelo in the center, and to his left there's a special agent, a law enforcement officer, and to his right there's another law

enforcement officer; is that correct?
A. Correct.
Q. And are they both attempting to restrain Mr. Arroyo-Sotelo's arms?
A. Yes.
Q. Now, what did you do as you approached the three of them?
A. I approached from the front. I got my handcuffs out -- at first I had my OC spray out in an attempt to maybe use that to calm the situation. I realized that everyone was too close together so I couldn't use that; so I put it away. I took out my handcuffs. I attempted to -- I saw an arm, like a wrist, that was free, and I grabbed that and tried to handcuff it.
But as I did, Agent Brummer from the IRS pulled away and said, "That's my arm." So he pulled away. And as he did, it also released his arm -- he was trying to hold the defendant's hand. So that freed the defendant's right arm completely.
Q. To be clear, you attempted to handcuff a hand that you saw was free?
A. Correct.
Q. Whose hand did you believe that was?
A. The defendant's.
Q. Okay. And then you're saying that it was actually one

of the agent's hands and he pulled his hand away?
A. It was.
Q. Okay. What happened when the agent pulled his hand away?
A. Almost immediate, as soon as he pulled his hand away, the defendant's arm, he just kind of lurched immediately at my gun, which was exposed. I had a marked police vest on. So, you know, he knew I was a police officer. I mean, I would think he thought so. He lurched at my gun, grabbed the top -- top side of my gun, and pulled on it to try to take it out of the holster.
Q. What arm was the defendant using when he reached for you?
A. His right arm.
Q. His right arm. So when the defendant reached with his right arm, you're saying that he grabbed your gun?
A. He did.
Q. How did he grab your gun?
A. He grabbed it with a full hand on top of the butt of the gun and yanked it towards him.
Q. Okay. And when you say "yanked it towards him," are we talking he yanked up or he just yanked forwards, towards his body?
A. Fortunately, he just yanked forward and the gun didn't go -- come out. Because if he would have went straight up,

the gun would have came out.

Q. All right. So what happened when Mr. Arroyo-Sotelo fully grabs your firearm and reached and -- excuse me, pulled it towards his body?

A. I made a defensive maneuver that I've been trained with, and I chopped down on his arm to get it off the butt of my gun.

Q. And did you say anything out loud?

A. Well, as soon as he grabbed my gun, I yelled out loud to the other officers so they knew that -- I yelled, "He grabbed my gun. He's got my gun," something to that effect.

Q. When you watched the body-worn camera in this case, can you -- did you hear yourself indicating to some effect that Mr. Arroyo-Sotelo had grabbed for your gun?

A. Yes, I did. I heard it.

Q. Okay. Now, after you used that sort of defensive maneuver to prevent Mr. Arroyo-Sotelo from grabbing your firearm, what happened?

A. He still was not being compliant. We were trying to get his right arm under control. And the agent -- the border patrol agent, CBP Agent Miranda, said, "I have a Taser. I have a Taser."

And so I said, "Okay. On the count of three, let's let go of him and so we can use the Taser. Let go of him and I'll take him down, and we can utilize the Taser if we

need it."
Q. I'm going to take this step by step. So let's start with the following. When you said on the count of three, let him go, did agents let him go?
A. They did.
Q. And did Mr. Arroyo-Sotelo stay still or did he move?
A. No. He tried -- he tried to run away immediately.
Q. He tried to run away?
A. Correct.
Q. Okay. So as Mr. Arroyo-Sotelo is trying to run away, what are agents doing?
A. The two agents backed off, and I hooked his arm, and we just -- I tried to tackle him to the ground.
Q. Okay. So at this point you have physical contact with Mr. Arroyo-Sotelo, and you're bringing him down to the ground?
A. Correct.
Q. Was Mr. Arroyo-Sotelo tased?
A. He was.
Q. Okay. So now I want to take that in turn.
When you brought him to the ground, what was happening? Was he still fighting or did he stop?
A. No, he was still -- we rolled around, and he was still fighting on the ground for probably 10 seconds.
Q. Can you describe for the Court, when you say "fighting,"

what are we talking about?
A. Just still throwing punches and, you know, just -- I'm sorry. You know -- you don't know. Throwing punches and trying to -- need to get away.
Q. And did any part of Mr. Arroyo-Sotelo's body -- again, while you were, you know, on the ground rolling with him, did any part of his body make contact with any part of your body during that scuffle?
A. The entire time.
Q. All right. Now, at what point was Mr. Arroyo-Sotelo tased?
A. Once he got up from -- he got up faster than I did. So I was still on the ground when he got tased. So at that point, I got up and he was being tased.
Q. All right. And was Mr. Arroyo-Sotelo ultimately successfully detained?
A. He was.
Q. Did you sustain any injuries to your body as a result of that scuffle that took place on the floor?
A. Yes.
Q. Can you describe those for the Court.
A. My left knee was scraped -- scraped really bad, and it bled and is still healing. And I suffered a contusion between my eyes from when we were rolling around on the ground.

Benaduim - Direct 20

Q. That you personally observed, did any other officers sustain injuries during that encounter?
A. The two other CBP officers did as well.
Q. Was Mr. Arroyo-Sotelo offered any medical attention?
A. Yes.
Q. And did he decline?
A. He declined.
Q. Now, we said that when CBP first approached Mr. -- or excuse me, the red sedan, they asked Mr. Arroyo-Sotelo if he had any documents to be in the United States; is that correct?
A. As I understand it, yes.
Q. And did you -- did you watch that encounter on body-worn camera?
A. I did.
Q. Now, later on was it ultimately confirmed that Mr. Arroyo-Sotelo is -- is an undocumented immigrant?
A. It was.
Q. And that he doesn't have a legal status to be in the United States?
A. Correct.
MS. CONCEPCION: Your Honor, I have no further questions.
THE COURT: Thank you.
Ms. Adams.

**CROSS-EXAMINATION**

BY MS. ADAMS:

Q. Good morning, Special Agent Benadum.

A. Good morning.

Q. Am I pronouncing your name correctly?

A. Yes.

Q. So you were part of a group of other law enforcement entities on the morning of October 10th?

A. Yes.

Q. How many of you total were there in that operation that day?

A. Four.

Q. Okay. And were there multiple vehicles that you were in?

A. Yes. We were each in our own vehicles.

Q. Okay. So there were four vehicles total that day?

A. Yes.

Q. And on direct examination, you noted, kind of, a larger array of investigative specialties that you're involved with?

A. Yes.

Q. But that day it was specifically immigration enforcement that you were out there doing?

A. For that portion of my day, yes.

Q. Okay. Sure. Yes. During this specific incident.

A. Yes.
Q. And you noted that you think that the target was D.A.R., but you're not exactly sure of the exact initials?
A. No. Right now I am not, no.
Q. But you are clear that the target that day was not Mr. Arroyo-Sotelo?
A. Correct.
Q. Okay. So you were out there on an immigration enforcement mission targeting another individual?
A. Correct.
Q. And that individual was specifically suspected of being in the United States unlawfully?
A. Correct.
Q. There was no other crime you were investigating that day?
A. Correct.
Q. It was only about immigration status?
A. Correct.
Q. You referred to Mr. Arroyo-Sotelo as a target?
A. No, I didn't refer to him -- I didn't refer to him as a target.
Q. Okay. So he was not a target that day?
A. Correct.
Q. And you did not know his identity at any point that day until it was confirmed after his arrest?

A. Correct.
Q. Okay. And you don't believe that any of the other officers you were with knew his identity?
A. Not to my knowledge.
Q. So no one was looking for him?
A. Not to my knowledge.
Q. It was happenstance that he was a passenger in this vehicle?
A. It appears that way.
Q. You noted at some point that you were parked in the Brooklyn Park or Brooklyn Center parking lot?
A. Correct.
Q. Where were you when Mr. Arroyo-Sotelo allegedly got into the red vehicle?
A. In the apartment complex -- parked in the apartment duplex.
Q. Of the Brooklyn Center?
A. Yes.
Q. Okay. So you were not, kind of, anywhere near the Fridley location?
A. No. We had followed the vehicle from the Fridley location to the apartment complex.
Q. Okay. So you were in Fridley when you're alleging Mr. Arroyo-Sotelo got into the car?
A. No. He didn't get in in Fridley.

Benaduum - Cross 24

Q. Got it. I think my misunderstanding.
A. Sure.
Q. So can you walk me through that again. The first individual got into the car in Fridley?
A. Correct.
Q. And then Mr. Arroyo-Sotelo got into the car in Brooklyn Center?
A. Correct.
Q. Okay. So he was the second or third person who got in the car?
A. He was the third person that got in the vehicle. There was the driver, our target, another passenger, and then they picked up Mr. Arroyo-Sotelo.
Q. So where in the car was Mr. Arroyo-Sotelo sitting during the traffic stop?
A. I believe he was the front passenger. He was the front passenger.
Q. On direct examination you talked a little bit about the actual traffic stop and what occurred when the CBP agent stopped the car. You were not present during the traffic stop?
A. I wasn't there when it initially occurred.
Q. Right. So when the CBP agents were initially encountering the individuals in the car, you were not on scene?

A. Correct.
Q. And so your familiarity with that stop comes from your review of body-worn-camera footage and the affidavit?
A. Correct.
Q. Is there any other source of information that you, you know, used to learn about what happened during that stop?
A. The agents.
Q. So you --
A. Speaking to the agents, yes.
Q. And you said there were -- you identified two CBP agents in particular.
A. Correct. There was another border patrol agent there as well.
Q. Did you speak to all three of them?
A. To the -- all three agents?
Q. Yes.
A. Yes.
Q. So in preparation for today's testimony, you reviewed body-worn-camera footage? Is that a yes?
A. Yes.
Q. You reviewed the affidavit?
A. Yes.
Q. And you spoke to all three of the other agents who were on scene that day?
A. Not in preparation for today's testimony. Only -- only

after we encountered -- had the encounter did I speak to them about later what happened when we first -- when you guys got there.
Q. Okay.
A. So I was familiar with what took place before I got there.
Q. Was that a debriefing conversation? What kind of conversation was that that you had with those agents?
A. I -- you could call it whatever you'd like. We didn't have a formal debriefing or anything. We just kind of spoke about what happened.
Q. Okay. So you're relying on the body-worn-camera footage, the affidavit in support of the complaint, and your, kind of, informal conversations with the three other agents following the arrest operation?
A. Correct.
Q. Okay. Did you take any notes in connection with this case?
A. None.
Q. Are you aware of any notes taken by the other agents?
A. None.
Q. Are you aware of any written memorialization of what happened other than the affidavit that supports the complaint in this case?
A. I believe we all documented our injuries --

Q. Okay.
A. -- on federal government forms, CA-1s. And I don't -- I don't know if any of the other agents took notes or documented their encounters.
Q. Okay. So there might be additional written documentation; you're just not specifically --
A. There could be.
Q. Okay. Did the documentation of injuries include photographs?
A. They did.
Q. All right. And you -- you mentioned on direct examination that you specifically reviewed one person's body-worn camera; is that right?
A. Correct.
Q. Whose was that?
A. Agent Miranda's.
Q. Agent Miranda. Okay.
And that was the person who initially approached the vehicle and made contact with the occupants during the traffic stop?
A. Correct. He was -- he was the initiating officer of that operation that day.
Q. What agency is Agent Miranda with?
A. CBP, border patrol.
Q. And do you know what his role is? Special agent or

something else?
A. I don't know his title, yeah.
Q. Were you equipped with body-worn camera that day?
A. I was not.
Q. Okay. So do you wear body-worn camera usually in --
A. No. Our agency doesn't -- doesn't have it.
Q. Okay. So HSI agents never have body-worn camera?
A. Well, I believe some have tested it, but I've never been issued it.
Q. Okay. So you've never been issued it or requested to wear body-worn camera --
A. Never.
Q. -- at all as part of your job with HSI?
A. Never.
Q. Okay. Are you aware of whether either of the two other agents were equipped with body-worn camera that day?
A. Yes.
Q. Okay. What --
A. The border patrol agent was. There was two border patrol agents on -- on scene.
Q. Okay. Agent Miranda. Who was the other border patrol agent?
A. I don't recall --
MS. CONCEPCION: Your Honor, at this point I am going to object.

A. I don't recall his name.

MS. CONCEPCION: I'm going to object as beyond the scope of the purpose of today's hearing. This appears to be questioning about the type of discovery that may be available in this case, which is, you know, certainly something that counsel might be concerned with. But at this point, you know, for the scope of this hearing, just to determine if there's probable cause on the complaint sufficient to move forward, Your Honor --

MS. ADAMS: Your Honor --

THE COURT: Ms. Adams, this does appear to be transitioning to a discovery deposition, but, of course, I'll hear you out.

MS. ADAMS: The special agent wasn't individually present for some of the important moments in this, so I am just trying to figure out what documentation that relates to probable cause might be available.

THE COURT: That's fine. The objection is overruled.

A. Okay. What was your question?

BY MS. ADAMS:

Q. I believe you were in the middle of saying you weren't sure. But I was asking if you knew the name of the other CBP agent who was there that day.

A. I only met him one other time so I don't recall his name

right now.
Q. And then you don't think the IRS agent had body-worn camera, or you don't know?
A. I don't believe he did, but I'm not a hundred percent positive, but I didn't see him with body-worn camera on.
Q. Okay. So you reviewed only Agent Miranda's body-worn camera?
A. Correct.
Q. Okay. Thank you. I will move on.
You noted that you reviewed the affidavit in support of the complaint in this case.
A. Yes.
Q. And I believe you were asked if it was true and accurate and complete, you know, to the best of your knowledge, and you said yes?
A. Correct.
Q. Okay. So fair to say that what's in the affidavit in support of the complaint is an accurate depiction of the events that occurred that day?
A. To the best of my knowledge, yes.
Q. Okay. Great.
You talked a little bit about what led -- or what interaction Agent Miranda had with Mr. Arroyo-Sotelo in the vehicle.
A. Okay.

Q. I just want to make clear, Mr. -- Agent Miranda asked Mr. Arroyo-Sotelo one or two questions about identity while he was still in the car?
A. I believe so.
Q. He declined to answer?
A. I believe so.
Q. And then Agent Miranda told him that he was under arrest?
A. I don't recall if that's what he told him or not. I wasn't -- I only -- I only viewed the -- I don't know if he told him he was under arrest right then or not or -- I believe he asked him to get out of the vehicle first.
Q. Would taking a look at the affidavit help to refresh your recollection of whether he was told he was being detained at that time?
A. Sure.
MS. ADAMS: Your Honor, may I approach?
THE COURT: Yes.
THE WITNESS: Thank you.
BY MS. ADAMS:
Q. I've handed you what I've received from the government as the criminal complaint and affidavit in support thereof in this case. Please feel free to review the whole thing.
My question is just about whether it would refresh your recollection on that point. I'll note that the --

paragraph 7 on page 3 is what relates to this particular factual scenario.
A. Okay. I've read paragraph 7.
Q. Okay. Great.
And did that help to refresh your recollection about the question I asked previously?
A. Well, the question was if he placed him under arrest. He said -- the affidavit says that would -- he detained him and would be brought to identify him, so.
Q. Okay. So we may be parsing language.
A. Right.
Q. But after Mr. Arroyo-Sotelo declined to answer questions, Agent Miranda indicated he would be detained?
A. Correct. Yes.
Q. And then the -- Agent Miranda opened the door and attempted to arrest Mr. Arroyo-Sotelo?
A. Yes.
Q. And Mr. Arroyo-Sotelo then attempted to leave the area?
A. Correct.
Q. Okay. And you arrived on scene when, as you described it, the agents were fighting with Mr. Arroyo-Sotelo?
A. Correct.
Q. And so fair to assume you arrived on scene after this initial attempted arrest?
A. Correct.

Q. Okay. And safe to say your overall impression of this encounter between these agents and Mr. Arroyo-Sotelo was that Mr. Arroyo-Sotelo was attempting to get away?
A. At the time he was attempting to fight him when I got there in hopes of getting away, I believe.
Q. Okay. So tell me a little bit more about what you mean by "fight."
A. By not being compliant.
Q. Okay. So he was trying -- he was struggling to get away from the officers arresting him?
A. Yes.
Q. Okay. At one point Officer Miranda grabbed Mr. Arroyo-Sotelo from behind and attempted to drag him backward to the vehicle; is that right?
A. Yeah, they were at the vehicle when I encountered them.
Q. Okay. And Mr. Arroyo-Sotelo was just continuing to attempt to escape?
A. He was not being compliant; correct.
Q. Okay. You talked a little bit about when you got involved in that struggle.
A. Uh-huh.
Q. You -- there was an incident where you are saying today Mr. Arroyo-Sotelo grabbed your firearm?
A. Correct.
Q. Did you previously discuss this incident with an FBI

special agent?
A. Yes.
Q. Okay. And that would be -- I apologize. Special Agent Alyssa Leary?
A. Correct.
Q. And that's the person who prepared the affidavit in support of the complaint in this case?
A. Yeah. That's right.
Q. So you described this struggle to Agent Leary?
A. I did.
Q. And is it your understanding that Agent Leary also watched the available body-worn camera in order to draft the affidavit in this case?
A. Yes.
Q. Okay. In the affidavit, Agent Leary notes that you felt pressure on your service firearm?
A. Correct.
Q. And that you felt a hand?
A. Yes.
Q. And that --
A. Felt and saw.
Q. Agent Leary doesn't note that you saw it --
A. Okay.
Q. -- though; right?
A. I'm just telling you, I saw it too.

Q. Okay. Were you kind of fulsome in your report to Agent Leary about what happened that day?
A. And can you clarify?
Q. When you're giving information to Special Agent Leary in support of this affidavit, you're trying to give her all the information you have -- right? -- that could be relevant?
A. Most -- yeah. I mean, I think I did, except maybe I didn't tell her I saw it too. So I did -- I did tell her that he grabbed my gun.
Q. You're trying to give her all of the most important information to include in the affidavit; right?
A. Correct.
Q. So if there's -- I guess, frankly, what I'm trying to get at here is seeing Mr. Arroyo-Sotelo grab your gun, seems like a pretty important part of the story; right?
A. Sure.
Q. But you didn't tell that to Agent Leary at the time?
A. I don't recall if I told her or if it just wasn't put in the affidavit.
Q. Okay. Fair enough.
You talked about on direct examination when you first walked up to Mr. Arroyo-Sotelo during that struggle, you attempted to handcuff him?
A. Yes.
Q. But it was a pretty chaotic scene --

A. It was.
Q. -- I imagine.
A. It was.
Q. Yes. And you actually handcuffed the wrong arm?
A. No. I grabbed the wrong arm.
Q. Oh, yes. Sorry. That's a misstatement on my part.
You grabbed the wrong arm?
A. Correct.
Q. You thought it was Mr. Arroyo-Sotelo's arm?
A. Right, because there was two wrists right in front of me.
Q. Yeah. And it's -- a lot is happening at that point?
A. Yeah.
Q. Pretty difficult to ascertain exactly what's happening?
A. Correct -- no, I could ascertain what was happening, but I just didn't know whose arm was whose.
Q. Sure. Okay. Fair enough.
You're aware that your firearm was swabbed for DNA in connection with this case?
A. Yes.
Q. Are you aware of whether any results of that have come in?
A. I'm not aware.
MS. ADAMS: Okay. No further questions, Your Honor. Thank you.

THE COURT: Any redirect?

MS. CONCEPCION: No, Your Honor. Thank you.

THE COURT: All right. Let me, if I could, Agent, just get one thing clear.

Going back to paragraph 7, page 3 --

THE WITNESS: Yes, sir.

THE COURT: -- it indicates there that Mr. Arroyo-Sotelo was the front passenger.

THE WITNESS: Correct, sir.

THE COURT: And I think you testified that he was the rear passenger. Can you shed -- am I right, first of all, that there was a difference between the affidavit and your testimony? And if there was, can you shed any light on it?

THE WITNESS: If I misspoke, Mr. Arroyo-Sotelo was the front passenger, and there was a rear passenger behind the front passenger.

THE COURT: And the rear passenger got in at Fridley, and Mr. Arroyo-Sotelo got in at Brooklyn something?

THE WITNESS: Yes, sir.

THE COURT: Got it.

Okay. Anything based on that by either counsel?

MS. CONCEPCION: No, Your Honor. Thank you.

THE COURT: Okay. Thank you. You're excused. I appreciate you coming in today.

(Witness excused.)

THE COURT: Ms. Concepcion, any other witnesses?

MS. CONCEPCION: No, Your Honor.

THE COURT: Any further evidence?

MS. CONCEPCION: No, Your Honor.

THE COURT: The government rests?

MS. CONCEPCION: Yes, Your Honor.

THE COURT: All right. Ms. Adams, any evidence for today?

MS. ADAMS: No, Your Honor.

THE COURT: All right. The question before the Court is whether there is probable cause to believe that Mr. Arroyo-Sotelo has violated 18 U.S. Code § 111 by assaulting a federal officer.

I find based upon the testimony of Special Agent -- and, Ms. Concepcion, the last name was?

MS. CONCEPCION: Benadum.

THE COURT: -- Benadum and also on the affidavit of Special Agent Leary of the FBI that probable cause does exist. And what that means, Mr. Arroyo-Sotelo, is that this case will go forward.

Next step -- I don't want to speak for the prosecutor, but will probably be to present the evidence to a grand jury and see if there is an indictment.

With that, we will turn to the question of detention

or release pending trial.

Ms. Concepcion, do you wish to be heard on that point?

MS. CONCEPCION: Yes, Your Honor. I was looking back to see if probation is here yet. I don't have the benefit of a bail report.

But, yes, the government is seeking detention of Mr. Arroyo-Sotelo.

THE COURT: For what it's worth, there is a pretrial services report. I've got a copy, and I did see pretrial services officers in the courtroom earlier.

MS. CONCEPCION: Okay.

THE COURT: Do we have reports?

THE PRETRIAL SERVICES OFFICER: Yes.

THE COURT: Could those be distributed, please.

MS. CONCEPCION: Thank you.

THE COURT: Ms. Adams, do you have a report?

MS. ADAMS: I have one from the initial appearance last week, Your Honor. I don't know if it's been updated since that time.

THE PRETRIAL SERVICES OFFICER: There's been no changes.

THE COURT: No changes.

Do you have the initial?

MS. CONCEPCION: No.

THE COURT: Okay.

MS. CONCEPCION: I don't.

THE COURT: All right. Let's get the prosecutor the initial, and let's -- we'll stay in place for five minutes -- it's short -- while she reviews it.

You can have a seat and just take a look at it.

MS. CONCEPCION: Thank you, Your Honor.

THE COURT: Let us know when you're ready to go.

(Off the record.)

MS. CONCEPCION: I appreciate the Court's indulgence while I reviewed the pretrial services report, Your Honor.

The government is ready to proceed and maintains that Mr. Arroyo-Sotelo should be detained because both there is -- by a preponderance of the evidence that he poses a risk of flight and clear and convin- -- excuse me, a risk to public safety and clear and convincing evidence. I may be messing it up, Your Honor, but --

THE COURT: You're getting it backwards.

MS. CONCEPCION: Okay. I'm getting it backwards. Thank you.

So preponderance of the evidence that he poses a risk of flight and clear and convincing evidence that he poses a risk to public safety, Your Honor.

And, frankly, it's based on the nature and

circumstances of the offense, based on the testimony that the Court has just heard, as well as the affidavit in support of the complaint. Mr. Arroyo-Sotelo fled from police. There were at least two instances during which he not only resisted being detained, but when he was let go during -- you know, when Agent Benadum said, okay, let him go and we'll try to tase him, when they let go, he didn't stop. He fled. And when he fled -- and he had to be taken down to the ground -- he didn't stop immediately.

Agent Benadum did describe that there was a fight on the ground during which he was punched and kicked and sustained injuries. So that indicates that he does pose a risk of flight, Your Honor. Frankly, he wanted to get away multiple times.

He failed to identify himself, Your Honor. He didn't want to be identified and certainly didn't want to be taken into custody.

And also, poses a risk to public safety, Your Honor. First and foremost, the obvious, the fact that he reached for a law enforcement's firearm when the agent was clearly marked as police officers is -- shows that he poses a risk to public safety. Thankfully, he didn't get ahold of the firearm. I don't want to make any assumptions about what would have happened, Your Honor, but, certainly, you can understand why that, at least to the government's

perspective, poses -- shows that there is clear and convincing evidence that he poses a risk to public safety.

Having just reviewed the bail report -- and also, I do see here that he also has a conviction for driving a motor vehicle while under the influence of alcohol, conviction that occurred in May of 2023, and he also has a DPS failure to appear for what appears to be a driving after revocation, but he failed to appear in court in August of 2024.

THE COURT: That's a DPS warrant. That will be the implied consent on the motor vehicle -- or on the driver license. So that would be a civil failure to appear.

MS. CONCEPCION: Oh, okay. All right. Thank you. I appreciate that.

So then at least one DWI conviction, Your Honor, showing he's been driving under the influence of alcohol.

So it's the government's opinion, Your Honor, that the -- based on the nature and circumstances of the offense and the history and characteristics of the defendant; not to mention the fact that he doesn't have any ties to Minnesota. I understand that he was picked up in Minnesota, but the bail report indicates that he was born in Mexico, remains a citizen of Mexico. There's no known address, no known employer or school.

And so based on the evidence before the Court, nature

and circumstances of the offense, and the characteristics of the defendant, the government is seeking detention on both grounds.

THE COURT: Thank you.

MS. CONCEPCION: Thank you, Your Honor.

THE COURT: Ms. Adams.

MS. ADAMS: Thank you, Your Honor.

First, just to address the last point Ms. Concepcion made, the reason there's no address or employer on Mr. Arroyo-Sotelo's bail report is because at the advice of counsel, and at the request of counsel, he was not approached for a pretrial services interview, and that's solely based on his immigration status. So I don't think that should be held against him here.

Of course, if he were actually to be released, he would have to, prior to release, give an address. The pretrial services agency would do their approval of an address. So I think that really shouldn't weigh in any direction here.

It's not true that Mr. Arroyo-Sotelo does not have connections to Minnesota. He has very strong connections to Minnesota. Mr. Arroyo-Sotelo is married to a United States citizen and has a 5-month-old child at home. He lives and works in Minnesota.

I think it's important here to kind of parse whether

Mr. Arroyo-Sotelo would be a risk of flight as that, you know, is relevant to his appearance in court for this case versus him trying to get away from the immigration enforcement action. Because I think that they really both kind of go in the same direction that Mr. Arroyo-Sotelo has such strong ties to Minnesota and such a reason to be here at home with his wife and child, that accepting the allegations in the complaint as true, what he was trying to do was get back to that home.

That was a period in which he was approached by, you know, ICE officers and other folks who come in many cars, often unidentified, often not wearing uniforms. He was pulled out of a car. It seemed like --

THE COURT: Do you dispute the evidence of Special Agent Benadum that he was wearing a vest that said police?

MS. ADAMS: I don't. No, Your Honor.

He was pulled out of a car.

THE COURT: Is there any evidence that Special Agent Benadum was wearing a mask?

MS. ADAMS: I don't know that, Your Honor. I haven't been given --

THE COURT: I'm asking whether there was any evidence of it.

MS. ADAMS: I'm not aware of any evidence.

THE COURT: Okay. And you didn't ask him about it?

MS. ADAMS: I didn't. No, Your Honor.

I haven't been given any discovery in this case yet so we'll be able to see when we look at the body-worn-camera footage whether there are masks being worn in this particular case.

But I think the real point is that Mr. Arroyo-Sotelo was not identified, was pulled out of a car. He was trying to get home to his wife and child. He has no history of violence. He has, you know, kind of minor driving-related offenses, one DUI from several years ago. He's a father now. He has shown up in court. He has done his community service. You know, he's kind of answered to the cases that he's had against him thus far.

I think the weight of the evidence here, which is a factor that Your Honor should consider, is really quite low. I think, first of all, there's a serious Fourth Amendment question here when it comes to whether there was probable cause for his arrest, for his seizure, on the day of October 10th when he was told he was arrested simply for being an unidentified passenger in the car when he declined to answer a simple question.

And my understanding -- although I have not reviewed the body-worn-camera footage because it hasn't been provided

to me yet -- is that the body-worn-camera footage does not show that Mr. Arroyo-Sotelo reached for a weapon in this case.

And so I think the fact that, you know, the government has let me know that and the fact that the affidavit really stands in contrast to the special agent's testimony today, the weight of the evidence that he was actually reaching for intentionally or grabbed a gun is really quite low at this point.

I think in terms of safety to the community, you know, Mr. Arroyo-Sotelo has a child. He works. He keeps his head down. He has really no criminal history. He has no history of violence whatsoever. He has every incentive to comply with the conditions of his release here now that, you know, he has a criminal case pending against him; his identity is clearly known. And he has every incentive to be compliant to stay in his home with his wife and child.

He is the primary provider in his household. So his wife stays home with his kid, and he is the one who is providing for his family. And so he really has every incentive to follow this Court's directive in order to maintain that position and stay with his family.

That's really all I have, Your Honor. Thank you.

THE COURT: Okay. Thank you.

Ms. Concepcion, does the body-worn camera

affirmatively show that Mr. Arroyo-Sotelo did not reach for a weapon, or does it simply show -- simply not have any information for or against that point?

MS. CONCEPCION: So I want to address two issues, Your Honor. First is that there -- I've only -- I only have in my possession right now one body-worn camera; so it's the only one that I have reviewed. It's the only one that Special Agent Benadum reviewed.

From my review of that camera, it -- when Mr. Arroyo-Sotelo was being, sort of -- attempted to be detained, his body covers the body-worn camera, and so you hear a lot of what's happening, a lot of, sort of, scuffling and shuffling. And you do hear quite audibly when Special Agent Benadum says he grabbed for my gun or he reached for my gun, or something to that effect.

But to answer the Court's question directly, do you see in that one body-worn camera Mr. Arroyo-Sotelo reach for the gun and pull it? No, you don't see it, which is why I brought Special Agent Benadum to come describe that to the Court.

THE COURT: Okay. Thank you.

MS. CONCEPCION: Thank you.

THE COURT: All right. On the question of detention, Mr. Arroyo-Sotelo, you are going to be detained while this case goes forward. I'm going to explain why in a

couple of minutes.

To begin with preliminaries, as the attorneys know, the U.S. Supreme Court in a case called *United States v. Salerno* said that a person can't be detained before trial unless there's a hearing, and that hearing has certain minimum standards, which were all met today.

For reasons that we can speculate about, rather than saying which offenses justified pretrial detention, Congress said which offenses justify a detention hearing. The result is the same. Without a hearing, under *Salerno*, you can't have detention. And so the first step in any detention analysis is to look at 18 U.S.C. 3142(f) and review the types of cases described there and see if this case is one in which a detention hearing can be held.

And I find that it is for three reasons. First of all, under 3142(f)(1)(A), the crime described in the complaint is a crime of violence. It is a crime of violence categorically because it is assault, and it is a crime of violence on the particular circumstances of this case because of the affidavit's description and Special Agent Benadum's description of a violent fight when Mr. Arroyo-Sotelo was -- attempted to be brought into custody. So there's that.

It is arguable, but I'm not aware of any legal authority one way or the other, that this is also a felony

that describes the possession or use of a firearm. I think, were I writing on a clean slate, that attempting to seize a law enforcement officer's firearm, quote, "involves the possession or use of a firearm," but as I say, that is not a question I have researched, and I simply at this point note it for the record.

In addition, under 18 U.S.C. 3142(2)(A) [sic], there's a serious risk that the person will flee. I take Ms. Adams' point that Mr. Arroyo-Sotelo was trying to escape, but the problem is that Mr. Arroyo-Sotelo -- the evidence has shown by at least probable cause that Mr. Arroyo-Sotelo tried to grab Special Agent Benadum's firearm.

That is, in my view, an extremely serious and an extremely dangerous act that could have resulted in who knows what, but certainly nothing good. And it is honestly, to your benefit, Mr. Arroyo-Sotelo, that you did not succeed in getting control of that firearm because you would have been in even more serious trouble than you are.

I, therefore, find that by clear and convincing evidence Mr. Arroyo-Sotelo is a risk to any other person or the community, and I find by a preponderance of the evidence that Mr. Arroyo-Sotelo is a risk of flight. And for those reasons, I will order that Mr. Arroyo-Sotelo be detained pending trial in this case.

Ms. Concepcion, I'll ask you to draft an appropriate detention order for my review that is based upon what I just said. I will also say, if I didn't before, the cite for the iffy basis for a detention hearing is 3142(f)(1)(E), as in Edward.

Ms. Concepcion, anything further for today?

MS. CONCEPCION: No, Your Honor. Thank you.

THE COURT: Ms. Adams?

MS. ADAMS: No, Your Honor. Thank you.

THE COURT: Thank you, all, very much for your time.

Court is adjourned.

(Proceedings were concluded at 10:56 a.m.)

CERTIFICATE OF COURT REPORTER

I, Nancy J. Meyer, Registered Diplomate Reporter, Certified Realtime Reporter, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true, and complete transcript of the proceedings to the best of my ability.

Dated this 31st day of December, 2025.

*/s/ Nancy J. Meyer*
Nancy J. Meyer
Official Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter